IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| VICTOR GLASCOE (DOC 334-230),<br>   *Plaintiff,*<br><br>            v.<br><br>OFFICER H. SOWERS,<br>   *Defendant.* | Civil Action No.: ELH-11-2228 |

**MEMORANDUM OPINION**

Plaintiff Victor Glascoe, an inmate at the State of Maryland's North Branch Correctional Institution ("NCBI"),[1] filed suit against Officer H. Sowers[2] under 42 U.S.C. § 1983. *See* Complaint (ECF 1). Defendant has filed a "Motion To Dismiss Or, In The Alternative, For Summary Judgment," pursuant to Rule 12(b)(6) and Rule 56 of the Federal Rules of Civil Procedure ("Motion," ECF 17), along with a supporting memorandum ("Memo," ECF 17-1), alleging that "Plaintiff's claims are barred by failure to exhaust administrative remedies." Motion at 1. Plaintiff opposes the Motion ("Opposition," ECF 28), to which defendant has replied ("Reply," ECF 33). No hearing is necessary to resolve the Motion. *See* Local Rule 105.6.

**Factual Background**[3]

Plaintiff avers that on October 2, 2010, defendant "yelled thru [sic] the port-hole at [him] in a very disrespectful and aggressive manner," Complaint at 4, asking: "Are you dumb or

---

[1] Plaintiff was self-represented at the time he filed suit, but is now represented by counsel.

[2] Officer Sowers's first name does not appear in the record.

[3] The Court must construe the facts alleged in the light most favorable to plaintiff, as the non-moving party. *See United States v. Diebold*, 369 U.S. 654, 655 (1962); *accord Scott v. Harris*, 550 U.S. 372, 380 (2007).

something?" *Id.* Plaintiff replied that "[his] mother did not raise any dummies…." *Id.* Defendant then approached plaintiff's cell and "told [him] to turn around to be handcuffed." *Id.* Another officer came on the scene and "asked [plaintiff] what was going on." *Id.* at 4-5. Plaintiff continues: "At this time the Defendant then literally placed the mace can in my face and sprayed it and called a code for assistance." *Id.* at 5. According to plaintiff, his "eye was injured," and he "contacted the Internal Investigation Unit of the Maryland State Police to initiate criminal action." *Id.* He contends that he is "being retaliated against for the complaints filed over this action and for meeting with" a representative from the Internal Investigation Unit on November 19, 2010. *Id.*

This suit followed, in which plaintiff seeks compensatory and punitive damages. *Id.* at 4. Additional facts will be included in the discussion.

**Standard of Review**

As noted, defendant has moved to dismiss, pursuant to Fed. R. Civ. P. 12(b)(6), or, in the alternative, for summary judgment, pursuant to Fed. R. Civ. P. 56. Ordinarily, summary judgment is inappropriate if "the parties have not had an opportunity for reasonable discovery." *E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 448 (4th Cir. 2011). However, "the party opposing summary judgment 'cannot complain that summary judgment was granted without discovery unless that party has made an attempt to oppose the motion on the grounds that more time was needed for discovery.'" *Harrods Ltd. v. Sixty Internet Domain Names*, 302 F.3d 214, 244 (4th Cir. 2002) (quoting *Evans v. Techs. Applications & Serv. Co.*, 80 F.3d 954, 961 (4th Cir. 1996)).

Generally, in order to raise the issue that discovery is needed, the party opposing the motion must file an affidavit or declaration pursuant to Rule 56(d) (formerly Rule 56(f)). Failure

to file a Rule 56(d) affidavit "is itself sufficient grounds to reject a claim that the opportunity for discovery was inadequate." *Evans*, 80 F.3d at 961. *But see Harrods Ltd.*, 302 F.3d at 244 ("[I]n some cases courts have held that summary judgment was premature even when the opposing party failed to file a [Rule 56(d)] affidavit."). Here, the parties have not engaged in discovery. But, plaintiff has not filed a Rule 56(d) affidavit. And, both parties have submitted numerous exhibits in support of their positions. Therefore, I will construe the Motion as one for summary judgment.

Under Rule 56(a), summary judgment is properly granted only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (citing former Fed. R. Civ. P. 56(c)). The non-moving party must demonstrate that there are disputes of material fact so as to preclude the entry of judgment as a matter of law. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). To meet this burden, the party opposing summary judgment must "do more than simply show that there is some metaphysical doubt as to the material facts." *Id.*; *see In re Apex Express Corp.*, 190 F.3d 624, 633 (4th Cir. 1999). Stated another way, "A party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [his] pleadings,' but rather must 'set forth specific facts'" showing that there is a dispute of material facts. *Bouchat v. Balt. Ravens Football Club, Inc.*, 346 F.3d 514, 522 (4th Cir. 2003) (quoting former Fed. R. Civ. P. 56(e)), *cert. denied*, 541 U.S. 1042 (2004); *see Celotex Corp.*, 477 U.S. at 322-24.

A fact is "material" if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). There is a genuine issue as to material fact "if the evidence is such that a reasonable jury could return a verdict for the

nonmoving party." *Id.*   In resolving the motion, the Court must consider the facts and all reasonable inferences in the light most favorable to the nonmoving party.  *Scott, supra*, 550 U.S. at 378.  The "judge's function" in reviewing a motion for summary judgment is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249.  If "the evidence is such that a reasonable jury could return a verdict" for the non-moving party, there is a dispute of material fact that precludes summary judgment.  *Id.* at 248.

## Discussion

### A.

Under the Prisoner Litigation Reform Act ("PLRA"), 42 U.S.C. § 1997e *et seq.*, a prisoner must exhaust his administrative remedies before filing suit.  42 U.S.C. § 1997e(a) provides: "No action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted."  The PLRA's exhaustion requirement "has been interpreted to require prisoners to pursue administrative grievances until they receive a final denial of their claim, appealing through all available stages in the administrative process." *Chase v. Peay*, 286 F. Supp. 2d 523, 530 (D. Md. 2003), *aff'd,* 98 F. App'x 253 (4th Cir. 2004).

In Maryland, there are three "levels" through which a prisoner's administrative grievance must proceed.  The first is the filing of "a Request for Administrative Remedy with the Warden of the Institution where the prisoner is incarcerated," commonly known as an "ARP." *Chase*, 286 F. Supp. 2d at 529 n.10.  In the event the ARP is denied, the prisoner must, within ten days, file an appeal with the Commissioner of Correction. *Id.*   If the appeal is unsuccessful, the

prisoner must, within thirty days, file an appeal with the Executive Director of the Inmate Grievance Office ("IGO"). *Id*. "[F]ailure to exhaust is an affirmative defense under the PLRA." *Jones v. Bock*, 549 U.S. 199, 216 (2007).

The record reflects that Glascoe submitted an ARP to the Warden on either October 4, 2010 or October 8, 2010.[4] Defendant's App'x at 20. The ARP is stamped as received by the Warden on October 12, 2010. *Id*. The Warden dismissed the ARP on November 23, 2010. *Id*. Plaintiff received the dismissal on December 1, 2010, and timely filed an appeal with the Commissioner of Correction on December 2, 2010. *Id.* at 17. The appeal was stamped as received December 9, 2010. *Id*. It was dismissed by the Commissioner on January 3, 2011. *Id.* at 18. The next step would have been for plaintiff to file, within thirty days, an appeal with the Executive Director of the IGO. The parties dispute whether this occurred.

The record shows that on May 24, 2011, plaintiff sent a letter to Scott Oakley, the IGO's Executive Director. *Id.* at 16.[5] But, the letter was dated January 28, 2011. Plaintiff suggests that, on May 24, 2011, he re-sent his letter of January 28, 2011. But, there is no indication in the record that Glascoe actually sent the letter of January 28, 2011, at a time corresponding to that date.

In the letter dated January 28, 2011, plaintiff requested "a formal IGO hearing." *Id.* at 14. At the bottom of the letter, plaintiff typed the following: "NOTE: This is my second request

---

[4] With its Motion, defendant submitted an appendix (hereinafter, "Defendant's Appendix") consisting of discrete items, totaling twenty-one pages. Therefore, I will refer to these exhibits by page numbers. Defendant has also submitted a number of exhibits with its Reply. As they are numbered, I will refer to them by the exhibit numbers assigned by defendant.

[5] A copy of the front of the envelope is included in the record. The postmark appears to read "25 May 2011," and in the lower left corner the following is handwritten: "Letter #2 sent out 5-22-11." *Id.* at 16. Defendant appended to the Reply, as part of Exhibit 1B, a copy of the back of the envelope, which indicates that on May 24, 2011, it was stamped at NCBI as "Outgoing Inmate Mail." *See* defendant's Exh. 1B at 21.

for a hearing, my first request was never answered. Please respond!" *Id.* at 15. The letter was stamped as received by the IGO on May 26, 2011. *Id.* at 14.

Plaintiff corresponded again with Oakley by letter dated July 7, 2011. In the letter of July 7, 2011, plaintiff asserted, *id*. at 7:

> I have been waiting literally six months for a response for the enclosed grievance that was mailed from here on January 10, 2011….I have heard from numerous inmates that they also have not heard from your office or that your Office has not been receiving grievances mailed from this facility.
> I am therefore requesting some sort of response indicating the status of my grievance or whether or not you actually received it at all. I have never filed one before and do not know the time limit, if any, for a response from your agency. Your assistance in this matter is greatly appreciated.

The letter of July 7, 2011, included as an enclosure a letter from plaintiff to Oakley with the date of January 10, 2011. *Id.* at 8-9. The numbers of the date were blacked out and the number "10" was inserted by hand. However, the text in the body of that letter is identical to the text in the letter of January 28, 2011, which Glascoe had sent to the IGO on May 24, 2011. *See id.* at 14. In addition, the letter of January 28, 2011, included a "NOTE" at the bottom, advising that it was Glascoe's second request for a hearing. But, that "NOTE" was omitted from the letter of January 10, 2011. *Id.* at 9.

The letter of July 7, 2011, was placed in an envelope and then that envelope was placed inside another envelope, which was mailed to the IGO with a name and return address for inmate Dontay Carter-El, DOC 232-657. *Id.* at 11. The submissions were stamped as received by the IGO on July 29, 2011. *Id.* at 7.

By letter of July 26, 2011, the IGO wrote to plaintiff. *Id.* at 12. In the letter, the IGO referred to the correspondence received from plaintiff on May 26, 2011, as "the first correspondence received from [plaintiff] in this matter." *Id*. The IGO also requested that plaintiff "provide copies of all ARP paperwork pertaining to th[e] grievance" in order to assist

6

the office in determining whether plaintiff "properly exhausted an available ARP remedy" and "timely filed this grievance," and whether he "stated a claim upon which administrative relief can and should be granted…." *Id.*

By letter dated August 22, 2011, plaintiff responded to the IGO's letter of July 26, 2011. *Id.* at 4. The envelope bears a postmark of August 25, 2011, *id.* at 5, and the letter was stamped as "RECEIVED" by the IGO on August 26, 2011. *Id.* at 4.[6] The letter notes that plaintiff's "entire ARP and ARP Appeal file[] was included with [his] grievance…." *Id.* at 4.

On August 26, 2011, Paula Williams, Associate Director of the IGO, wrote to plaintiff, apparently in response to plaintiff's letter of July 7, 2011, and not to his letter of August 22, 2011. *Id.* at 6. As indicated, *infra*, the IGO never responded to plaintiff's letter of August 22, 2011. In the letter of August 26, 2011, Williams wrote, in part, *id.*:

> I note from the ARP paperwork you provided[7] that the Commissioner's response to your ARP appeal is dated January 3, 2011. Given the more than 4 months from the date of the Commissioner's response to the filing of this grievance and the absence of any allegation that you received the Commissioner's response within the 30 days immediately preceding the filing of this grievance, I infer that you received the Commissioner's response more than 30 days prior to the filing of this grievance and I conclude that you failed to file your grievance within the 30 days required by COMAR 12.07.01.05(B). Since this time limitation has not been waived for good cause shown, COMAR 12.07.01.05(F), COMAR 12.07.01.06(B)(3) requires that this grievance be dismissed as wholly lacking in merit.
>
> Accordingly, your grievance is hereby administratively dismissed pursuant to Md. Code Ann. Corr. Serv. § 10-207(b)(1) as having been determined to be wholly lacking in merit, and this file is closed.

---

[6] Defendant appended to the Reply a copy of the back of the envelope, which indicates that it was stamped at NCBI on August 24, 2011, as "Outgoing Inmate Mail." *See* defendant's Exh. 1B at 3.

[7] As noted, on July 26, 2011, the IGO requested copies of plaintiff's "ARP paperwork." It appears that, as plaintiff claims, the IGO had the necessary ARP paperwork on July 26, 2011, notwithstanding its suggestion to the contrary in its letter of July 26, 2011.

It appears that Ms. Williams's letter of August 26, 2011, crossed in the mail with plaintiff's letter of August 22, 2011,which was received by the IGO on August 26, 2011. Of import here, the letter has the following handwritten notation in the lower left corner: "8/29/11 No response needed. Crossed in mail PW." *Id.* at 4.

As noted, defendant insists that plaintiff's suit is barred for failure to exhaust administrative remedies, because his appeal to the IGO was untimely. *See id.* at 6. Plaintiff counters that he timely appealed, and that the letter to the IGO must have been misplaced. Opposition at 2.

In plaintiff's "Declaration," appended to the Opposition as plaintiff's Exhibit A, plaintiff avers, under penalty of perjury, that he "mailed to the Inmate Grievance Office an appeal of the decision of the Administrative Law Judge on January 28, 2011." *Id.* ¶ 2. He asserts: "Attached hereto is a copy of the request for hearing that was submitted." *Id*. As noted, although the letter appended to the Declaration was dated January 28, 2011, the letter was not mailed until May 24, 2011, and it was received by the IGO on May 26, 2011.

Plaintiff has not produced any physical proof that he mailed the letter dated January 28, 2011, at or around the date of January 28, 2011. Nevertheless, he asserts, under oath, *id.* ¶ 3: "On January 28, 2011, I placed my appeal in the mailbox in front of the chow hall. This is the designated area for inmates to mail their letters. A staff member picks up the mail at 7:00 a.m. each day." Although plaintiff "expected that the appeal would be sent out in a timely manner," *id.* ¶ 4, he maintains that "[o]nce [he] put the letter in the mailbox [he] had no further control [over] when the letter was sent, when the letter was received, or when it was time-stamped by the Inmate Grievance Office." *Id.* ¶ 5. Plaintiff explains, *id.* ¶ 6: "When I did not receive a timely

response, I sent a second letter dated July 7, 2011, a copy of which is attached hereto, requesting a response to my January 28, 2011, appeal."[8]

In plaintiff's view, he "did everything that [he] could do to fulfill the time requirements for filing [an] appeal." *Id.* ¶ 7. He states: "One can only speculate as to the reason when[9] the first letter was purportedly not received." Opposition at 2. He concludes: "There exists a question as to what became of the original letter. Under these circumstances whether or not the appel [sic] was timely filed is a disputed fact, which would be best left to the determination of the jury." *Id.* at 3.

Neither the Opposition nor the Declaration clarifies why the "second letter" was dated January 28, 2011, if it was not sent on that date; why the date on that letter was changed to January 10, 2011, when it was enclosed with plaintiff's letter to the IGO dated July 7, 2011; or why plaintiff's letter dated July 7, 2011, was sent to the IGO in an envelope sent by another inmate, Dontay Carter-El.

In response to the Opposition, defendant submitted information about "Mail Protocol at NCBI." Reply at 3. Defendant's Exhibit 2 is the Declaration of Bradley Wilt, who serves as the "Housing Unit Manager" for the unit to which plaintiff is assigned at NCBI. Wilt explains that the mailbox to which plaintiff referred in his Declaration is locked and inaccessible to Housing Unit staff. *Id.* ¶ 3. The "North Compound Officer" obtains the key from the "Duty Lieutenant in Operations," then unlocks the mailbox and transfers the mail to a secured mailbag, which he then delivers to the NCBI Gatehouse mailroom. *Id.*

---

[8] A copy of that letter was not appended to the Declaration but, as discussed, it has been made part of the record.

[9] Context and common sense suggest that plaintiff intended to state: "One can only speculate as to the reason *why* the first letter was purportedly not received."

9

In the Declaration of NCBI Warden Bobby Shearin, Defendant's Exh. 3, ¶ 5, the Warden adds: "[O]nce inmate mail is placed at the NCBI Gatehouse mailroom, it is retrieved by the escort officer on duty and taken to the NCBI/WCI mailroom, which is located at the Western Correctional Institution [('WCI')], where it is sorted and dispensed by mailroom staff. The NCBI Gatehouse mailroom is located directly across from the NCBI Gatehouse, which is manned twenty four hours a day, every day."

Kathy Jacobs, Office Processing Clerk Supervisor for the NCBI/WCI mailroom, explains in her Declaration, Defendant's Exh. 4, ¶ 7, the procedures that are followed when mail arrives at the NCBI/WCI mailroom:

> On each business day…each piece of mail delivered that day from inmate postal service mailboxes is stamped with the day's date and the name of the facility from which it was collected. After date-stamping the mail, Mailroom staff places the mail into post office mail tubs. On that day or the next business day, the supply officer secures the post office mail tubs in his vehicle and delivers them to the United States Post Office for mailing.

Jacobs adds that "an inmate who has sufficient funds in either his active or reserve inmate account may send a legal mailing by certified mail to have proof of mailing for future reference." *Id.* ¶ 8.[10] She asserts: "At no time, to my knowledge, was Victor Glascoe's outgoing mail, legal or otherwise, withheld, delayed, or not processed, when said mailing was in compliance and consistent with approved policies and directives of the Maryland Division of Correction." *Id.* ¶ 5. Further, Jacob avers: "To the best of my knowledge and belief, no one employed by the NCBI/WCI mailroom has hindered the delivery or stolen any mail belonging to Victor Glascoe or any other inmate." *Id.* ¶ 9.

---

[10] In his Declaration, Wilt describes the procedure by which inmates may send certified mail. *See* Defendant's Exh. 2 ¶ 4.

Mary Jo Williams, Fiscal Accounts Clerk Manager for Inmate Accounts at NCBI avers in her Declaration that, "during November 9, 2010 through February 28, 2011, there was continuously $50.00 in Inmate Glascoe's reserve fund account," enough to pay for certified mailing. Defendant's Exh. 5 ¶ 4. She appended documentation of plaintiff's account to support her assertion.

In addition to detailing the mail system at NCBI, defendant's Reply points to inconsistencies in plaintiff's submissions. Sowers notes that the correspondence IGO received from plaintiff on May 26, 2011, which was purportedly plaintiff's second notice to IGO, bears the date of January 28, 2011, Reply at 4, which accords with plaintiff's assertion in his Affidavit that he sent his "first letter" on January 28, 2011. *Id*. at 5 (citing to plaintiff's Exhibit A ¶ 3). But, defendant emphasizes, Reply at 5, that in plaintiff's letter to the IGO of July 7, 2011, he wrote: "I have been waiting literally six months for a response for the enclosed grievance that was mailed from here on *January 10, 2011*." Defendant's App'x at 7 (emphasis added). Defendant also notes, Reply at 5, that the enclosure to the correspondence of July 7, 2011, was "altered to January 10, 2011 by the '28' having been blacked out and '10' written above…." *See* Defendant's App'x at 8.

Defendant posits that "Plaintiff used the mailings to the IGO to create an appearance that he had mailed a timely appeal when he had not done so." Reply at 8. Defendant observes: "Mr. Glascoe has at times presented two different dates for the crucial date of his mailing of his grievance appeal with the IGO. Based upon those facts, the Defendant argues that the summary judgment standard, familiar to this Court, calls for the resolution of this action in his favor." *Id*. at 7. In defendant's view, "the two inconsistent versions of [plaintiff's] story presented by documents that he himself sent (or had another inmate send to the IGO) would not result in a

11

reasonable jury being able to render a verdict for the Plaintiff." *Id*. And, defendant characterizes as "unsupported speculation" plaintiff's position that "there must have been an error by NCBI or the IGO." *Id.* at 9.

B.

As noted, failure to exhaust administrative remedies is an affirmative defense under the PLRA. *Jones*, 549 U.S. at 216. Failure to exhaust, however, "only applies if administrative remedies are actually available to the prisoner." *Ryidu-x v. Wolfe*, No. WDQ–11–358, 2011 WL 5122633, *3 (D. Md. Oct. 25, 2011). Moreover, "an administrative remedy is not considered to have been available if a prisoner, through no fault of his own, was prevented from availing himself of it." *Moore v. Bennette*, 517 F.3d 717, 725 (4th Cir. 2008).

It is "a settled general rule" that "the burden of proving an affirmative defense is on the party asserting it." *McNeill v. Polk*, 476 F.3d 206, 220 n.3 (4th Cir. 2007). "[T]o be entitled to bring suit in federal court, a prisoner must have utilized all available remedies 'in accordance with the applicable procedural rules,' so that prison officials have been given an opportunity to address the claims administratively." *Moore*, 517 F.3d at 725 (citation omitted).[11] "Having done that, a prisoner has exhausted his available remedies, even if prison employees do not respond." *Id.* (citing *Dole v. Chandler,* 438 F.3d 804 (7th Cir. 2006)).

*Dole* is instructive. In that case, Dole, a prisoner, claimed he had been beaten by guards in retaliation for attacking an assistant warden. *Dole, supra,* 438 F.3d at 805. As required by Illinois regulations, he attempted to file a grievance with the Administrative Review Board ("ARB"), a body similar to the IGO, before the deadline to do so had lapsed. *Id*. Dole placed his

---

[11] In his Reply, defendant asserts: "The Plaintiff has made no allegation that any prison official prevented him from accessing the grievance procedure." *Id.* at 9. But, if plaintiff was prevented from accessing a remedy because his correspondence was mishandled by NCBI or the Postal Service, he was not able to access the grievance process.

12

complaint in an envelope addressed to the ARB, and placed the envelope in the "chuckhole" of his cell for the guard to mail; this was the only mailing procedure available to him. *Id.* at 807. He received no response from the ARB. *Id.* Eventually, he wrote to inquire about the status of his grievance, and was told that the ARB had no record of his grievance. *Id*. He was given no instructions on how to proceed, and the sixty day period in which he could file such a grievance had already passed. *Id.* at 807-08. Instead of attempting to file another grievance, Dole filed suit in federal court, pursuant to 42 U.S.C. § 1983. *Id*. at 808. Thereafter, the defendant moved for summary judgment on the ground that Dole had not exhausted his administrative remedies under the PLRA. *Id*. The trial court granted the motion for summary judgment, having "found it significant that Dole had taken no further action after learning that the ARB had no record of his complaint," reasoning "that if merely placing the grievance in the mail constituted exhaustion under the PLRA, then any prisoner could circumvent the exhaustion requirement by claiming that he mailed a complaint." *Id*.

The Seventh Circuit reversed and remanded. It reasoned: "By properly mailing his ARB complaint, alerting the ARB that the complaint was mailed, and filing suit only after the ARB failed to clarify what he should do next, Dole had done all that was reasonable to exhaust his administrative remedies." *Id.* at 812. The court was persuaded that "Dole could not maintain control of his complaint once the guard picked it up," and "had no choice in the method used to transmit the complaint from the prison to the [ARB]." *Id.* at 810. The court also noted that Dole lacked the "means of being alerted that the ARB had not received his appeal in time to file a new, timely complaint[, as] Illinois has no receipt system for prisoner mail." *Id*.

The court, *id.* at 812, quoted the following passage from *Houston v. Lack,* 487 U.S. 266, 270-72 (1988), a case concerning the Antiterrorism and Effective Death Penalty Act

13

("AEDPA"), in which the Supreme Court ruled that a pro se prisoner's appeal is "filed" within the meaning of AEDPA when it is placed in the hands of the guards:

> The situation of prisoners seeking to appeal without the aid of counsel is unique. Such prisoners cannot take the steps other litigants can take to monitor the processing of their notices of appeal and to ensure that the court clerk receives and stamps their notices of appeal before the 30-day deadline. Unlike other litigants, *pro se* prisoners cannot personally travel to the courthouse to see that the notice is stamped "filed" or to establish the date on which the court received the notice. Other litigants may choose to entrust their appeals to the vagaries of the mail and the clerk's process for stamping incoming papers, but only the *pro se* prisoner is forced to do so by his situation. And if other litigants do choose to use the mail, they can at least place the notice directly into the hands of the United States Postal Service (or a private express carrier); and they can follow its progress by calling the court to determine whether the notice has been received and stamped, knowing that if the mail goes awry they can personally deliver notice at the last moment or that their monitoring will provide them with evidence to demonstrate either excusable neglect or that the notice was not stamped on the date the court received it. *Pro se* prisoners cannot take any of these precautions; nor, by definition, do they have lawyers who can take these precautions for them. Worse, the *pro se* prisoner has no choice but to entrust the forwarding of his notice of appeal to prison authorities whom he cannot control or supervise and who may have every incentive to delay.... And if there is a delay the prisoner suspects is attributable to the prison authorities, he is unlikely to have any means of proving it, for his confinement prevents him from monitoring the process sufficiently to distinguish delay on the part of prison authorities from slow mail service or the court clerk's failure to stamp the notice on the date received.... [T]he only information he will likely have is the date he delivered the notice to those prison authorities and the date ultimately stamped on his notice.

(Alterations in *Dole*).

The *Dole* Court acknowledged that the Supreme Court's ruling in *Houston* could "result in the potential for prisoners to fraudulently claim that their appeal was mailed within the statutory deadline when it was actually mailed shortly after that time," but noted that the Supreme Court "chose to accept that risk of fraud." *Dole,* 438 F.3d at 812. The Seventh Circuit concluded: "We believe that the potential for fraud does not justify obligating truthful prisoners to prove that they mailed their complaints when the prison authorities do not provide them with means for verification." *Id.* at 813.

*Baughman v. Harless*, 142 F. App'x 354 (10th Cir. 2005), is also instructive. In that case, Baughman, a prisoner, brought suit against various Oklahoma Department of Corrections employees, alleging, *inter alia*, that they had deprived him of adequate dental care in violation of the Eighth Amendment. *Id.* at 355. Baughman averred in his complaint that he had exhausted his administrative remedies through the Oklahoma Department of Corrections Inmate Grievance System, a three step process. *Id*. According to Baughman, he had placed appeals of his grievances in the prison mail, but never received any responses. *Id.* at 356. The defendants moved for summary judgment, alleging that Baughman failed to exhaust his administrative remedies. In their view, even "[a]ssuming he did mail his grievance appeal," which defendants disputed, "Baughman should have inquired when he did not receive a timely response to his appeal…." *Id.* at 357. They asserted that "mere mailing was insufficient to satisfy exhaustion requirements." *Id*. The district court agreed, and granted defendants' motion. *Id*.

The Tenth Circuit reversed. It stated that, "under the circumstances presented here, grievance appeals may have become unavailable through the actions or inactions of the prison mail room. If Mr. Baughman was hindered from exhausting his administrative remedies by the failure of prison officials to mail his grievance appeals, then the grievance procedure is unavailable." *Id.* at 359. Although Baughman "made no attempt to cure the fact that he never received a response to his grievance appeals," the *Baughman* Court observed that "prison regulations…place no such responsibility on a prisoner." *Id*.

To be sure, there are inconsistencies in plaintiff's submissions. And, the Court is sensitive to obvious concerns about inmates who, having missed crucial deadlines, later submit fabricated documents purporting to show timely claims that were allegedly lost. Moreover, it is true that plaintiff merely speculates that the appeal allegedly sent in January 2011 was somehow

15

lost by NCBI or the United States Postal Service. But, defendant meets that speculation with speculation of his own—that the letter was not sent to the ISO in or about January 28, 2011, and was not lost in the mail.

As the Fourth Circuit has said, "an administrative remedy is not considered to have been available if a prisoner, through no fault of his own, was prevented from availing himself of it." *Moore*, *supra,* 517 F.3d at 725. In asserting that no reasonable jury could credit plaintiff's account in this matter, defendant asks the Court to make a credibility determination, which it is unable to do given the posture of this case. "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge, whether he is ruling on a motion for summary judgment or for a directed verdict." *Anderson*, *supra*, 477 U.S. at 255. A reasonable jury could credit plaintiff's account. Defendant's descriptions of the NCBI "mail protocol" do not compel the conclusion that plaintiff's contentions are false. Moreover, notwithstanding defendant's references to certified mail, there is no requirement for the transmission of administrative appeals by certified mail. Because there is a dispute of material fact, summary judgment on this basis is not appropriate. *Id.* at 248.

## Conclusion

For the foregoing reasons, the Court will deny defendant's Motion (ECF 17). A separate Order, consistent with this Opinion, follows.

Date: June 18, 2012                            /s/
                                               Ellen Lipton Hollander
                                               United States District Judge