IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

VICTOR GLASCOE,
   *Plaintiff*,

v.

OFFICER H. SOWERS,
   *Defendant*.

Civil Action No. ELH-11-2228

## MEMORANDUM OPINION

Victor Glascoe, plaintiff, an inmate at the State of Maryland's North Branch Correctional Institution ("NBCI"), filed suit under 42 U.S.C. § 1983 against Officer Herman Sowers. His claims arise from an incident on October 2, 2010, in which defendant administered pepper spray into plaintiff's eyes. Glascoe, who is represented by counsel, alleges that Sowers' actions and use of pepper spray were unreasonable and malicious, causing injury to Glascoe's eyes, in violation of his Eighth Amendment right against cruel and unusual punishment.[1]

After the conclusion of fact discovery, Sowers filed a motion for summary judgment ("Motion") (ECF 44). Glascoe filed an Opposition (ECF 53) and Sowers filed a Reply (ECF 54). Both parties also submitted numerous exhibits. *See* Note 3, *infra.*

The Motion has been fully briefed, and no hearing is necessary to resolve it. *See* Local Rule 105.6. For the reasons that follow, I will grant the Motion.

---

[1] Glascoe originally filed suit *pro* se, but counsel appeared on his behalf before defendant responded to his complaint. *See* ECF 16. In his complaint, Glascoe asserted a claim of retaliation by Officer Sowers, in addition to his Eighth Amendment claim. In connection with briefing this motion, however, he has "withdraw[n] his claim that Officer Sowers retaliated against him." ECF 53 at 9. Accordingly, it is only necessary to consider the Eighth Amendment claim in this Opinion.

## Factual Background[2]

NBCI is a maximum security prison. Motion at 3. On October 2, 2010, Glascoe was in his cell, Cell 5 on D Terrace in Housing Unit Four. *See* Glascoe Dep. at 17; Sowers Aff. ¶ 2. D Terrace or "D Wing," which the parties sometimes refer to as the "tier," consists of two rows of cells (an upper row of cells, accessible by a catwalk, and a lower row of cells on ground level) adjoining an open common space. Glascoe Dep. at 16-17. Cell 5 is on the lower level.

At that time, Glascoe was told by the tier officer that Captain Becker wanted Glascoe to make an emergency phone call. Glascoe Dep. at 44-46. The tier officer escorted Glascoe from his cell, out of the tier, through the C/D Terrace lobby, and down a hallway towards a back office used for various individual meetings with prisoners. *Id*. Upon reaching his mother by phone,

---

[2] The Factual Background is drawn from the exhibits submitted by the parties, which include the deposition of Mr. Glascoe ("Glascoe Dep.") (ECF 44-3; ECF 53-2); the Affidavits of Mr. Glascoe ("Glascoe Aff.") (ECF 53-3), Officer Sowers ("Sowers Aff.") (ECF 44-10), Officer Klink ("Klink Aff.") (ECF 44-15), and Officer Hochard ("Hochard Aff.") (ECF 44-14); a Notice of Inmate Rule Violation and Disciplinary Hearing ("Violation Notice") (ECF 44-4); Internal Investigative Unit Criminal Investigation Report 103501427 ("Investigation Report") (ECF 44-16) (ECF 53-6); and Glascoe's Patient Records ("Patient Records") (ECF 53-7). Unless otherwise noted, the facts presented are the version of events most favorable to Mr. Glascoe. *See T–Mobile Northeast LLC v. City Council of City of Newport News*, 674 F.3d 380, 385 (4th Cir. 2012) (stating that, when considering a motion for summary judgment, a court must construe the facts in the light most favorable to the non-moving party).

The exhibits also include four videos of the prison areas in which the incident took place, recorded by surveillance cameras at NBCI. *See* Affidavit of Eldred R. Durst, Exhibit 1 ("Durst Aff. Ex. 1") (ECF-44). The four videos, discussed *infra*, are overlaid with the date and the running time (in the format "hours:minutes:seconds PM," with hours represented in a 12–hour format, *i.e.,* "civil time"). I have cited to the individual videos by reference to the approximate time displayed and the area of NBCI they captured. The videos begin at 12:10:04 PM on "10/2/2010" and the descriptive titles correspond to the record as follows:

    HU4-DVR2 D Wing Front Rt.: "Tier Back"
    HU4-DVR2 D Wing Back Lt.: "Tier Front"
    HU4-DVR3 C/D Corridor: "Control Center"
    HU4-DVR3 D Wing Rec Hall: "Hallway"

Glascoe learned that a family member had died. After the phone call, he was escorted back to the lobby. On one side of the lobby area was a prisoner holding cell. On the other side of the lobby was the control center for C/D Terrace. Hallway at 12:12:36 PM. Officer Sowers was in the control center, working the 7:00 a.m. to 3:00 p.m. shift, monitoring the movement of inmates within Housing Unit Four. In his affidavit, Officer Sowers stated that, from his position in the control center, he observed Glascoe standing in the lobby area, which is an "area that is restricted and an inmate may not be in the area without permission." Sowers Aff. ¶ 3.

While in the lobby area and facing the holding cell, Glascoe talked to a correctional officer in the hallway. Hallway at 12:12:48 PM. At his deposition, Glascoe stated that he informed the correctional officer in the hallway that he was finished with the call and the office needed to be locked up. Glascoe Dep. at 48. He further clarified in his affidavit that he spoke only to the officer and not to an inmate who was confined in the holding cell. Glascoe Aff. ¶ 1.[3] In order to impel Glascoe to move from the lobby and end his conversation, Officer Sowers kicked the large glass window separating the control center from the lobby three times.[4] *See* Violation Notice; Sowers Aff. ¶ 5; Hallway at 12:12:57 PM; Control Center at 12:12:57 PM. Glascoe finished his conversation and returned to the tier without responding to Officer Sowers' kicks. Sowers Aff. ¶ 5. Hallway at 12:12:36 PM. At his deposition, Glascoe explained why he

---

[3] In his report and affidavit, Officer Sowers averred that Glascoe was speaking with an inmate in the holding cell. *See* Violation Notice; Sowers Aff. ¶ 4. However, Glascoe's testimony, which appears to be corroborated by the video, is that he spoke with a correctional officer.

[4] The record is ambiguous as to whether Officer Sowers accompanied his kicking with a verbal order. His affidavit states: "I directed Inmate Glascoe to return to his cell three separate times before he complied with my orders." Glascoe Aff. ¶ 5. But, Sowers did not expressly state that he gave Glascoe a verbal command. It is also not clear whether a verbal command would have been audible through the glass window separating the control center from the lobby.

disregarded Sowers' kicks: "I wasn't in the wrong. I wasn't doing nothing, and I'm assuming he wasn't trying to get my attention, so I went on and [walked] on the tier." Glascoe Dep. at 49.

Once Glascoe was back on the tier, he talked to Officer Nathan Klink, the tier officer, about "calling [his] mother back on [his] own phone," stating: "I ain't going to stay back there in the office by myself." Glascoe Dep. at 49. After finishing his conversation with Officer Klink, Glascoe turned towards his cell. *See* Sowers Aff. ¶ 5; Hallway at 12:12:36 PM. At around that time, Officer Sowers walked up to a porthole between the tier and the control center and called to Glascoe. *See* Sowers Aff. ¶ 6; Hallway at 12:13:05 PM. At his deposition, Glascoe stated that he heard Officer Sowers call, "Hey, hey, hey, you. . . . Yes, you come up here." Glascoe Dep. at 49. Glascoe walked up to the porthole, where Glascoe and Officer Sowers conversed. Tier Front at 12:13:12 PM. At his deposition and in his affidavit, Glascoe recalled that Officer Sowers said: "What are you a dummy or something?" *See* Glascoe Dep. 49; Glascoe Aff. ¶ 2. Glascoe replied, "Man, look, my mama ain't raised no dummies." *Id.* Officer Klink, the tier officer, then ordered Glascoe to return to his cell. There was no further conversation with Sowers at the porthole. *See* Glascoe Dep. at 50; Klink Aff. ¶ 5.[5]

With another officer from the control center, Sowers exited the control center to enter the tier as Glascoe returned to his cell door. *See* Glascoe Dep. at 50; Hallway at 12:13:33 PM; Control Center at 12:13:33 PM. In his affidavit, Glascoe stated that, as he "was proceeding [to

---

[5] According to Officer Sowers, Sowers also informed Glascoe that he was "out of bounds" and needed to show Sowers his ID so that Sowers could write a violation notice. In Sowers' recollection, Glascoe "informed [Sowers] that he would need to retrieve [his ID] from his cell and [Glascoe] began to walk away." *See* Violation Notice; Sowers Aff. ¶ 6. Because I must construe the facts in the light most favorable to plaintiff, I have adopted Glascoe's version of the encounter.

the cell, he] was thinking about the news that [he] had gotten concerning the death in [his] family." Glascoe Aff. ¶ 4. Officer Sowers walked toward Glascoe and directed him to "Put [his] hands on the wall." Glascoe Dep. at 50; Violation Notice; Sowers Aff. ¶ 8; Klink Aff. ¶ 6. In reply, Glascoe asked: "What? . . . For What? What Did I Do?" Glascoe also walked towards Officer Sowers. In his affidavit, Officer Sowers stated that Glascoe had his fists "clinched [sic]" and "assumed an aggressive posture," Sowers Aff. ¶ 7, while Glascoe counters that he did not take an aggressive stance. Glascoe Aff. ¶ 4. The video shows Glascoe's arms raised about 20 degrees from his sides and held slightly forward (his body language does not appear inconsistent with that of someone asking, "What Did I Do?"). However, the video is not detailed enough to determine whether his fists were "clinched." Tier Front at 12:13:58 PM.

As Sowers approached, he again commanded Glascoe to put his hands on the wall and asked, "Are you refusing?" Glascoe replied, "Yes, man, you ain't going to spray me with that mace." Sowers asked, "You refuse?" Glascoe responded, "I'm trying to see Sergeant Spears." *See* Glascoe Dep. at 50; Sowers Aff. ¶ 8. Officer Sowers reached out to grab Glascoe's arm, but Glascoe pulled away. *See* Violation Notice; Tier Front at 12:14:01 PM. Officer Sowers then removed a pepper spray cannister from his belt and applied the first dose of pepper spray. *See* Sowers Aff. ¶ 9; Hochard Aff. ¶ 6; Klink Aff. ¶ 8; Tier Front at 12:14:03 PM.

As shown in the Tier Front video, Officer Sowers and two other correctional officers gathered around Glascoe after Sowers first administered pepper spray. Sowers denied Glascoe's request to see Sergeant Spears, and another officer said, "come on Mr. Glascoe, I'm going to cuff up [sic]." *See* Glascoe Dep. at 50; Sowers Aff. ¶ 8. Officer Sowers was able to place handcuffs on one of Glascoe's wrists and bend Glascoe's cuffed arm backwards as the other two officers

watched. *See* Glascoe Dep. at 61; Klink Aff. ¶ 7. As a fourth and fifth officer entered the tier, Officer Sowers pushed Glascoe against the wall. Tier Front at 12:14:27 PM. One of the other officers, Officer Hochard, assisted Officer Sowers, but both were unable to secure Glascoe's free wrist in the handcuffs. *See* Violation Notice; Hochard Aff. ¶ 5; Klink Aff. ¶ 7. Glascoe leaned backwards against the officers and planted his feet in the joint between the wall and the floor as the officers tried to place the cuff around his free wrist. The group of officers then pushed Glascoe back against the wall. Tier Front at 12:14:47 PM.

Officer Sowers then applied the pepper spray a second time.[6] *See* Violation Notice; Sowers Aff. ¶ 10; Hochard Aff. ¶ 8; Klink Aff. ¶ 9; Tier Front at 12:14:57 PM. Officers Sowers, Klink, and Hochard pulled Glascoe to the floor. Tier Front at 12:15:05. Glascoe freed his arm twice more, but the officers were finally able to place Glascoe's free wrist in the handcuffs. *See* Violation Notice; Sowers Aff. ¶ 10; Hochard Aff. ¶ 9; Klink Aff. ¶ 9; Tier Front at 12:15:20 PM.[7] A sixth officer entered the tier and joined the officers gathered around Glascoe. Tier Front at 12:15:27 PM. Two of the officers lifted Glascoe to his feet, and he was taken out of D Terrace and led down the hallway. Hallway at 12:16:22 PM. Glascoe was placed in Housing Unit 1, showered within ten minutes after the incident, and saw a registered nurse around 12:40 p.m., twenty-five minutes after the incident. *See* Glascoe Dep. at 65; Patient Records at 21.

---

[6] At his deposition, Glascoe identified this as the first incident of pepper spray. Glascoe Dep. at 61. However, the video clearly contradicts this account.

[7] At his deposition and in his affidavit, Glascoe stated that Officer Sowers applied an additional dose of pepper spray while he was face down on the floor. However, the group of officers was such that no clear corroboration can be provided by video and the officers make no mention of a third application of pepper spray. *See* Glascoe Dep. at 52; Glascoe Aff. ¶ 5; Tier Front at 12:15:34 PM. In any event, the video makes clear that Glascoe continued to struggle even after he was pulled to the floor.

Glascoe was charged in an internal disciplinary proceeding with two rule violations stemming from the incident, to which he pleaded guilty. Glascoe Aff. ¶ 7. The Inmate Hearing Record, Ex.D to Opposition (ECF 53-5), reflects that Glascoe waived representation or the right to call witnesses at the hearing, *see id.* at 1, and that the hearing officer sentenced Glascoe to "30 days of cell restriction," in accordance with a "plea agreement with the institution." *Id.* No transcript or other verbatim account of Glascoe's statements at the hearing is contained in the record, and the Inmate Hearing Record does not reflect whether Glascoe's guilty plea was taken under oath. In his affidavit, Glascoe stated that he entered into the plea agreement thinking that "it was in [his] best interest to plea[d] to the charges rather than fight them and then be sentenced to a prolonged period [of punishment]." Glascoe Aff. ¶ 7. However, in his deposition he also stated that he "wouldn't have ever plead[ed] guilty to this when I knew I wasn't in the wrong." Glascoe Dep. at 94.

At his deposition, Glascoe stated that, as a result of the incident, he now has to wear glasses and use eye drops. Glascoe Dep. at 81. Glascoe filed a complaint with the Internal Investigative Unit of the Maryland Department of Public Safety and Correctional Services ("DPSCS"). *See* Glascoe Dep. at 97; Investigation Report. The Internal Investigative Unit's Report stated the following, Investigation Report at 6:

> It's concluded that Inmate Victor Glascoe did resist the efforts of Officer Herman Sowers as he was attempting to handcuff him.
>
> It also appeared from the video that Officer Sowers was irritated when the inmate ignored his directions from within the Control Center and when Officer Sowers grabbed for Glascoe's arm the inmate pulled away.
>
> It is suggested that Officer Sowers did not apply effective communication skills to avoid a confrontation with Inmate Glascoe and based on the facts of this case criminal charges against the officer and or inmate are not warranted.

Additional facts will be included in the Discussion.

**Standard of Review**

Under Rule 56(a) of the Federal Rules of Civil Procedure, summary judgment is appropriate only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to the judgment as a matter of law." The Supreme Court has clarified that this does not mean that any factual dispute will defeat the motion: "By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there is no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–248 (1986) (emphasis in original).

A fact is "material" if it "might affect the outcome of the suit under the governing law." *Anderson*, 477 U.S. at 248. There is a genuine issue as to material fact "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* As previously mentioned, in resolving the motion, the Court must consider the facts and all reasonable inferences in the light most favorable to the nonmoving party. *T–Mobile Northeast*, *supra*, 674 F.3d at 385. The "[judicial] function" in reviewing a motion for summary judgment is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249. If "the evidence is such that a reasonable jury could return a verdict" for the non-moving party, there is a dispute of material fact that precludes summary judgment. *Id.* at 248.

Many, but not all, of the relevant events are clearly visible in the videos submitted as exhibits. As Judge Diana Motz explained in *Witt v. West Virginia State Police, Troop 2*, 633 F.3d 272 (4th Cir. 2011), "when a video 'quite clearly contradicts the version of the story told by [the plaintiff] . . . so that no reasonable jury could believe it, a court should not adopt [the plaintiff's] version of the facts for purposes of ruling on a motion for summary judgment.'" *Id.* at 276 (quoting *Scott v. Harris*, 550 U.S. 372, 378 (2007)). However, this principle does not license a court to "reject a plaintiff's account on summary judgment" if the "documentary evidence, such as a video," merely "offers *some* support for a governmental officer's version of events." *Witt*, 633 F.3d at 276 (emphasis in original).

Moreover, the videos contain images only, without sound, and the picture quality of the videos is lacking in some respects. Accordingly, to the extent that the videos clearly depict the events at issue, they will prevail over contrary evidence submitted by either side. However, to the extent that the videos are unclear and ambiguous, the Court must adopt plaintiff's version of events for purposes of the Motion.

**Discussion**

To state a claim under 42 U.S.C. § 1983, a plaintiff must allege a violation of a federal constitutional right or a right secured by federal law. *See Baker v. McCollan*, 443 U.S. 137 (1979). A convicted inmate's claim that a prison officer used excessive force is examined in the context of the Eighth Amendment's prohibition against cruel and unusual punishment. *See Whitley v. Albers*, 475 U.S. 312, 319-21 (1986); *see also Wilkins v. Gaddy*, 559 U.S. 34, 36 (2010) (per curiam); *Hudson v. McMillan*, 503 U.S. 1, 7-9 (1992).

Against Glascoe's Eighth Amendment claim, Officer Sowers claims that Glascoe's constitutional rights were not violated. Alternatively, even if Glascoe's rights were violated, Sowers claims he is entitled to qualified immunity.[8]

**I.**

The Supreme Court has made clear that "not 'every malevolent touch by a prison guard gives rise to a federal cause of action'" under the Eighth Amendment. *Wilkins*, 559 U.S. at 37 (quoting *Hudson*, 503 U.S. at 9). The use of force by a prison officer violates an inmate's Eighth Amendment rights when such force is "inconsistent with contemporary standards of decency," *Estelle v. Gamble*, 429 U.S. 97, 103 (1976), or is "'repugnant to the consciousness of mankind.'" *Wilkins*, 559 U.S. at 38 (quoting *Hudson*, 503 U.S. at 9). The Eight Amendment inquiry is focused on whether the "force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." *Hudson*, 503 U.S. at 7.

---

[8] Officer Sowers also argues that Glascoe's guilty plea in the internal disciplinary hearing forecloses him from arguing that Officer Sowers' use of pepper spray exceeded the bounds of a good-faith effort to restore discipline. Defendant relies on a principle of summary judgment practice, commonly known as the "sham affidavit rule," which provides that "a party cannot create a genuine issue of fact sufficient to survive summary judgment simply by contradicting his or her own previous sworn statement (by, say, filing a later affidavit that flatly contradicts that party's earlier sworn deposition) without explaining the contradiction or attempting to resolve the disparity." *Cleveland v. Pol'y Mgmt. Sys. Corp.*, 526 U.S. 795, 806 (1999) (recognizing that lower federal courts have adopted the sham affidavit rule with "virtual unanimity" but declining to "necessarily endorse these cases," although adopting a similar rule with respect to whether a person who applies for social security disability benefits is thereby estopped from pursuing a disability discrimination claim under the Americans with Disabilities Act); *see also Barwick v. Celotex Corp.*, 736 F.3d 946, 960 (4th Cir. 1984) (adopting sham affidavit rule and stating that a "genuine issue of material fact is not created where the only issue of fact is to determine which of the two conflicting versions of the plaintiff's testimony is correct").

Even without applying the sham affidavit rule, I conclude that Glascoe has not generated a genuine dispute of material fact sufficient to survive summary judgment. Accordingly, I need not resolve whether Glascoe's apparently unsworn guilty plea in the internal disciplinary proceeding could support application of the sham affidavit rule.

There are multiple factors that are relevant to the inquiry: "'the need for the application of force, the relationship between the need and the amount of force that was used, . . . the extent of injury inflicted.' . . . the extent of the threat to the safety of staff and inmates, as reasonably perceived by the responsible officials on the basis of the facts known to them, and any efforts made to temper the severity of the response." *Whitley*, 475 U.S. at 321 (quoting, in part, *Johnson v. Glick*, 481 F.2d. 1028, 1033 (2nd Cir. 1973)). Although the "extent of the injury suffered by an inmate is one factor that may suggest 'whether the use of force could plausibly have been thought necessary in a particular situation,'" *Hudson*, 503 U.S. at 7 (quoting *Whitley*, 475 U.S. at 321), lack of a permanent or "significant" injury is not dispositive. *Wilkins*, 559 U.S. at 36-37. Put another way, there is no "de minimis" level of injury that is an acceptable result of excessive force under the Eighth Amendment. *Id.* at 38-40. If force is applied maliciously and sadistically, liability is not avoided "merely because [the plaintiff] has the good fortune to escape without serious injury." *Id.* at 38. Ultimately, "[i]njury and force . . . are only correlative, and it is the latter that ultimately counts." *Id.*

In regard to the use of pepper spray by prison officers, "'[i]t is generally recognized that it is a violation of the Eighth Amendment for prison officials to use mace, tear gas, or other chemical agents in quantities greater than necessary or for the sole purpose of inflicting pain.'" *Iko v. Shreve*, 535 F.3d 225, 240 (4th Cir. 2008) (quoting *Williams v. Benjamin*, 77 F.3d 756, 763 (4th Cir. 1996)) (emphasis omitted). However, pepper spray is not "per se a cruel and unusual punishment," *McCargo v. Mister*, 462 F. Supp. 813, 818 (D. Md. 1978), and can be used to "control a recalcitrant inmate" without violating the Eighth Amendment. *Williams*, 77 F.3d at 763.

In chemical agent cases there are three general areas in which courts have held that use of pepper spray or other chemical agents may constitute excessive force in violation of the Eighth Amendment. First, an Eighth Amendment violation has been found when an officer used far more than a reasonable quantity of a chemical agent. *See, e.g.*, *Furnace v. Sullivan*, 705 F.3d 1021, 1025 (9th Cir. 2013) (finding Eighth Amendment violation where officer discharged can of pepper spray until empty, and other officer also joined in); *Lawrence v. Bowersox*, 297 F.3d 727, 732 (8th Cir. 2002) (same, where prisoner's entire cell was doused in pepper spray using fire-extinguisher-like device); *DeSpain v. Uphoff*, 264 F.3d 965, 978 (10th Cir. 2001) (same, where officer indiscriminately sprayed entire prison tier).

Second, Eighth Amendment violations have also been found when a chemical agent was used without a prior verbal command, or after a prisoner had been subdued or had become compliant with an officer's instructions. *See Tedder v. Johnson*, ___ F. App'x ___, 2013 WL 2501759 (4th Cir. June 12, 2013) (stating that pepper spray employed on visibly sick inmate may constitute excessive force); *Johnson v. Blaukat*, 453 F.3d. 1108 (8th Cir. 2006) (finding triable Eighth Amendment claim where officers allegedly used pepper spray as a first resort without prior verbal command); *Treats v. Morgan*, 308 F.3d 868, 872 (8th Cir. 2002) (finding triable Eighth Amendment claim where there was evidence that inmate "did not intentionally disobey [officer], use profanity or abusive language, or threaten any correctional officer, and . . . was [pepper] sprayed without warning").

Finally, courts have concluded that the Eighth Amendment can be violated when, after a prisoner is pepper sprayed (even for a legitimate reason), officers then withhold appropriate medical attention. *See, e.g.*, *Walker v. Bowersox*, 526 F.3d. 1186, 1189 (8th Cir. 2008) (finding

Eighth Amendment violation where prisoner was barred from showering or changing for three days after pepper spray incident); *Norton v. City of Marietta*, 432 F.3d 1145, 1153-54 (10th Cir. 2005) (finding triable Eighth Amendment claim where officer pepper sprayed inmate's eyes for 5-7 seconds from two inches away, as if "'he was spray-painting [plaintiff's] face,'" and then ignored inmate's pleas for assistance, other than "toss[ing] some water in his eyes"); *Foulk v. Charrier*, 262 F.3d 687 (8th Cir. 2001) (affirming Eighth Amendment verdict against officer where, after officer "sprayed pepper spray directly into [inmate's] face," inmate "received no medical care and had no ability to wash off the pepper spray, [and] continued to feel its painful effects for several days").

The Fourth Circuit's 2008 decision in *Iko v. Shreve*, *supra*, 535 F.3d 225, involving use of pepper spray in extracting an inmate from his cell, illustrates each of the three categories. There, the Court observed that "some dispersal of pepper spray" was unquestionably "warranted in carrying out the cell extraction," because the inmate "did not initially comply with orders to 'cuff up.'" *Id.* at 239. Nevertheless, the *Iko* Court held that the defendant officer was not entitled to qualified immunity for his use of pepper spray because, in the light most favorable to the inmate, the officer "deployed several additional bursts of pepper spray even after [the inmate] attempted to comply with orders," *id.* at 239-40; the inmate was "docile and passive throughout the cell extraction," *id.* at 239; the officer's "final burst of pepper spray was deployed *after* [the inmate] had lain down on the floor of his cell," *id.* at 240 (emphasis in original); and, "far from trying to ameliorate the effects of the pepper spray, [the officer] and the extraction team never changed [the inmate's] clothing, never removed the spit mask covering his nose and mouth, and never secured him any medical treatment for the exposure." *Id.*

However, if an inmate repeatedly ignores official commands, multiple applications of pepper spray have been found reasonable. *See Williams*, 77 F.3d at 763 (finding no Eighth Amendment violation where officer administered pepper spray after prisoner asked "Why?" in response to command); *Jackson v. Morgan*, 19 F. App'x. 97, 102 (4th Cir. 2001) (upholding use of pepper spray twelve times when inmate refused to comply with commands to move from his cell); *Norris v. Detrick*, 918 F. Supp. 977, 984 (N.D.W. Va. 1996) (upholding use of two blasts of pepper spray when inmate refused to return to his cell during lockdown). Use of chemical agents is reasonable when a prisoner attempts to escape or evade an officer's control. *See Grayson v. Peed*, 195 F.3d 692, 696 (4th Cir. 1999). Finally, use is also reasonable when an officer is attempting to maintain order and discipline in the institution. *Santiago v. Walls*, 599 F.3d. 749, 757 (7th Cir. 2010) (determining that Eighth Amendment was not violated where pepper spray was used to break up inmate fight); *Combs v. Wilkinson*, 315 F.3d. 548, 558 (6th Cir. 2002) (holding use of pepper spray during prison riot appropriate).

In examining the use of and need for force in this situation, I conclude that "no reasonable jury could return a verdict" for Glascoe. *Anderson*, *supra*, 477 U.S. at 249. In light of the video and Glascoe's candid admissions at his deposition, there is no genuine factual dispute that Glascoe asked, "For what? What did I do?", in response to Officer Sowers' command to "Put his hands on the wall"; he then pulled away when Officer Sowers reached for his arm, and continued to struggle as Officer Sowers and others attempted to put on handcuffs. *See* Glascoe Dep. at 50, Tier Front at 12:14:01 PM–12:15:05 PM. At each command, and at any point during the encounter, Glascoe could have complied with Officer Sower's request, but he instead remained non-compliant and struggled with the officers. Based on the undisputed facts,

it was reasonable for Officer Sowers to determine that pepper spray was appropriate in subduing Glascoe, given the failure of verbal commands and additional correctional officer involvement to secure Glascoe's compliance.

Glascoe offers that Sowers took "umbrage" at his "my momma ain't raised no dummies comment" and such an attitude established malicious intent in using the pepper spray. Opposition at 6. Certainly, as noted in the DPSCS investigation report, Officer Sowers "was irritated when [Glascoe] ignored his directions" and "did not apply effective communication skills to avoid a confrontation." Investigation Report at 6. But, even if Sowers might have communicated more effectively with Glascoe before the incident occurred, that gave the inmate no license to defy or question the officer's lawful, repeated commands to put his hands on the wall and "cuff up." Where application of pepper spray is measured and comes in response to an inmate's persistent non-compliance with verbal commands, this fact points away from a finding of unconstitutional excessiveness.

In addition, the use of pepper spray in this instance was consistent with guidance provided in the Use of Force Procedures Manual ("Manual") (ECF 44-11) promulgated by DPSCS. Prison regulations and training for correctional officers are "relevant in determining whether an inmate's right" was violated, as they "further institutional safety and other prudential considerations." *Furnace*, 705 F.3d at 1027; *see Hope v. Pelzer*, 536 U.S. 730 (2002) (Alabama Department of Corrections regulation specified appropriate procedures for using hitching post); *Iko*, 535 F.3d at 240 (Maryland Division of Correction Directive governing use of force established that some pepper spray was appropriate in cell extraction).

The Manual describes the use of force continuum for non-compliant inmates, requiring first "[s]taff presence: Confrontation avoidance . . . by visibly establishing a physical presence of sufficient personnel;" and then "[v]erbal direction . . . Confrontation avoidance to deter . . . through verbal interaction," before the "[u]se of chemical agent: . . . temporarily distracting, disorienting, or immobilizing the inmate . . . by means of chemical agents." Manual §5.03(A)(1)-(3). Glascoe remained non-compliant although multiple officers were present and Officer Sowers and another officer directed him to "cuff up." Glascoe Dep. at 50; Sowers Aff. ¶ 8. Officer Sowers used the pepper spray after staff presence and verbal direction failed to render Glascoe compliant, and was engaging in a "good faith effort to maintain or restore discipline" with Glascoe. *Hudson*, 503 U.S. at 6-7.

Finally, the correctional officers promptly took steps to reduce the effects of pepper spray. Prompt washing and medical attention have been considered a sufficient step to mitigate the use of chemical agents. *See Williams*, *supra*, 77 F.3d at 763. Within ten minutes, Glascoe had showered to remove the pepper spray and was then taken to the medical unit. *See* Glascoe Dep. at 65; Patient Records at 21. Such actions provide "immediate relief from pain" and are one reason that application of a chemical agent such as pepper spray or mace to a non-compliant inmate can be "'much more humane and effective than a flesh to flesh confrontation.'" *Williams*, 77 F.3d at 763 (quoting *Soto v. Dickey*, 744 F.2d 1260, 1262 (1984)).

For all of the foregoing reasons, I conclude that Glascoe has not raised any genuine dispute of material fact. And, even when all disputed facts are resolved in Glascoe's favor, no reasonable jury could conclude that Officer Sowers violated Glascoe's rights under the Eighth Amendment through his application of pepper spray.

## II.

Even if Glascoe's Eighth Amendment right had been violated, Officer Sowers is entitled to qualified immunity.

The doctrine of qualified immunity shields government officers from liability for conduct that "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982); *accord Bland v. Roberts*, ___ F.3d ___, 2013 WL 5228033, No. 12-1671, slip op. at 52 (4th Cir. Sep. 18, 2013). Thus, "officers who commit constitutional violations but who, in light of clearly established law, could reasonably believe that their actions were lawful" are entitled to immunity from suit. *Henry v. Purnell*, 652 F.3d 524, 531 (4th Cir. 2011) (en banc), *cert. denied*, ___ U.S. ___, 132 S. Ct. 781 (2011); *accord Durham v. Horner*, 690 F.3d 183, 188 (4th Cir. 2012).

The qualified immunity analysis can be separated into two inquiries: (1) whether the facts alleged, "[t]aken in the light most favorable to the party asserting the injury . . . show the officer's conduct violated a [federal] right," *Saucier v. Katz*, 533 U.S. 194, 201 (2001); and (2) whether the right at issue "was clearly established in the specific context of the case—that is, [whether] it was clear to a reasonable officer that the conduct in which he allegedly engaged was unlawful in the situation he confronted." *Merchant v. Bauer*, 677 F.3d 656, 662 (4th Cir. 2012) (citation omitted). Courts may exercise "their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Pearson v. Callahan*, 555 U.S. 223, 236 (2009).

If there is a violation of a constitutional right, the court's next step is to "ask whether the right was clearly established. . . . in light of the specific context of the case, not as to a broad general proposition." *Saucier*, 533 U.S. at 201. This requirement helps balance two important interests: "the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties responsibly." *Pearson*, 555 U.S. at 231.

The second inquiry "turns on the 'objective legal reasonableness' of the action, assessed in light of the legal rules that were 'clearly established' at the time it was taken." *Messerschmidt v. Millender*, ___ U.S. ___, 132 S.Ct. 1235, 1245 (2012) (citing *Anderson v. Creighton*, 483 U.S. 635, 639 (1987)). "To be clearly established, a right must be sufficiently clear 'that every reasonable official would [have understood] that what he is doing violates that right.' In other words, 'existing precedent must have placed the statutory or constitutional question beyond debate." *Reichle v. Howards*, ___ U.S. ___, 132 S.Ct. 2088, 2093 (2012) (quoting *Ashcroft v. al-Kidd*, 563 U.S. ___, 131 S.Ct. 2074, 2078, 2083 (2011)) (some internal quotation marks and citations omitted). "If the law at th[e] time [of the alleged violation] was not clearly established," the official will be entitled to qualified immunity, because "an official could not reasonably be expected to anticipate subsequent legal developments, nor could he fairly be said to 'know' that the law forbade conduct not previously identified as unlawful." *Harlow,* 457 U.S. at 818. On the other hand, "[i]f the law was clearly established, the immunity defense ordinarily should fail, since a reasonably competent public official should know the law governing his conduct." *Id.* at 818–19.

In regard to chemical agents, it is only an Eighth Amendment violation "'for prison officials to use mace, tear gas, or other chemical agents [when] in quantities greater than necessary or for the sole purpose of inflicting pain.'" *Iko*, 535 F.3d. at 240 (quoting *Williams*, 77 F.3d at 763). The video confirms that pepper spray was applied while Glascoe was confronting Officer Sowers and when Glascoe was actively struggling with officers in an attempt to prevent them from placing him in handcuffs. Tier Front at 12:14:03 PM and 12:14:57 PM. Without contradiction from Glascoe, Officer Sowers and the other correctional officers whose affidavits have been provided described the sprays as "short bursts." Sowers Aff. ¶ 9; Hochard Aff. ¶ 8; Klink Aff. ¶ 8. These facts, combined with the guidance of the Use of Force Continuum in the DPSCS Use of Force Procedures Manual, establish that Officer Sowers could not reasonably anticipate that his actions would go beyond a "quantity greater than necessary." *Williams*, 77 F.3d at 763. Nor is there evidence to suggest that the pepper spray was administered "for the sole purpose of inflicting pain." *Id.*

Accordingly, even if Officer Sowers' actions violated Glascoe's Eighth Amendment rights, Officer Sowers would be entitled to qualified immunity.

For all of the foregoing reasons, I will grant Sowers' motion for summary judgment. An appropriate Order follows.

Date: September 20, 2013                      /s/
                                              Ellen Lipton Hollander
                                              United States District Judge